IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| DAVID JARVIS,<br><br>           Plaintiff,<br><br>     vs.<br><br>CORTEVA AGRISCIENCE, LLC,<br><br>           Defendant. | Civil No. 23-00396 MWJS-RT<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## <u>INTRODUCTION</u>

In this lawsuit, Plaintiff David Jarvis alleges that he informed his then-employer, Defendant Corteva Agriscience, LLC, that he believed an altercation between two of his coworkers was racially motivated and that his own supervisor had made racially discriminatory comments in the past.  Corteva completed its investigation of the incident and took no action against the supervisor.  Still, Jarvis' supervisor was not pleased:  according to Jarvis, the supervisor began excluding him from weekly management meetings and even asked him "how testifying against him was working out."  Several months later, Jarvis himself was investigated for his misuse of a company credit card—an investigation prompted by Jarvis' supervisor.  And after that investigation ended, Corteva terminated Jarvis.

Based on these and other allegations, Jarvis contends that he was fired in retaliation for his comments about his coworkers' fight and his manager's discriminatory remarks, rather than in response to his misuse of company funds. He claims that his termination therefore violated federal and state anti-retaliation and whistleblower statutes. And he seeks, among other things, punitive damages.

Corteva now moves for summary judgment, arguing that Jarvis' claims fail as a matter of law. The court GRANTS in part and DENIES in part Corteva's motion. In short, as explained more fully below, Jarvis' claims survive, but his request for punitive damages—which he altogether fails to defend in his opposition to Corteva's motion—does not.

## BACKGROUND

Jarvis was hired by Corteva in 2012. ECF No. 47, at PageID.226 (Def.'s Concise Statement of Facts (CSF) ¶ 1). Around 2018, Alika Napier became Jarvis' supervisor. ECF No. 47-3, at PageID.237. Jarvis alleges that at some point in 2019, Napier referred to some minority employees as "slaves" and used other derogatory terms to describe Filipino employees. ECF No. 60, at PageID.355 (Jarvis Decl. ¶¶ 14-16); ECF No. 63-2, at PageID.397-98. Jarvis does not specifically allege that he reported Napier's comments at that time.

The next year, Jarvis' performance review noted that he had "challenges with [his] personal expenses charged to a company credit card." ECF No. 47, at PageID.226

2

(Def.'s CSF ¶ 4). Corteva took no disciplinary action, however, and despite behavior and performance concerns, Jarvis received an overall "Consistent" rating. ECF No. 47-4, at PageID.295.

Two years passed, apparently without incident. But in the fall of 2021, the altercation at the heart of this lawsuit occurred. An agronomist allegedly called a production technician a "f**kface." ECF No. 47, at PageID.226 (Def.'s CSF ¶ 5). And according to Jarvis, the agronomist also "thr[e]w[] an object" at the technician "in a fit of rage." ECF No. 60-1, at PageID.361 (Jarvis Decl. ¶ 6).

Corteva opened an internal investigation into that conflict (the "Agronomist Investigation"), and Jarvis was interviewed. *Id.* (¶ 9); ECF No. 47, at PageID.226 (Def.'s CSF ¶ 5). Jarvis did not initiate the incident complaint, he was not an investigator, and he was not involved in reviewing the initial allegations related to the incident. ECF No. 47, at PageID.227 (Def.'s CSF ¶ 7). The notes from Jarvis' interview during the Agronomist Investigation "do not include any report of discrimination or any reference to a legally protected class of any kind." *Id.* (¶ 11). Jarvis, though, maintains that he told the investigator that "the Agronomist was discriminatory toward Filipino employees." ECF No. 60-1, at PageID.361 (Jarvis Decl. ¶ 10). And when the investigator "asked if [Jarvis] wanted to say anything else, [he] told Corteva's investigator that [he] had witnessed Alika Napier being discriminatory to minority employees." *Id.* at PageID.362 (¶ 13). Jarvis reported that Napier "referred to

3

minorities as 'Slaves' in the workplace," used profanity and slurs when referring to Filipino employees, and "threaten[ed] minority employees with physical violence." *Id.* (¶¶ 14-17). And Jarvis further maintains that he had already reported these incidents of discrimination to a human resources employee, Michelle Matsuda, though he does not specify when he made that report. *Id.* (Jarvis Decl. ¶ 18).

After his interview, Corteva completed the Agronomist Investigation without further involvement by Jarvis. The company concluded that "[w]hile the unprofessional use of profanity by the agronomist was substantiated, the conduct was found not to constitute harassment or [a] hostile work environment under the relevant legal criteria, and the lack of professionalism was addressed with the employee." ECF No. 47-3, at PageID.238.

In the days and months following his interview, Jarvis attests that he noticed changes in the way he was treated. After his interview was completed, Jarvis says that he saw "the investigator, Ms. Matsuda, and Alika Napier go to lunch." ECF No. 60-1, at PageID.362 (Jarvis Decl. ¶ 19). A few days later, Jarvis adds, "Napier began excluding [Jarvis] from the weekly management meetings." *Id.* (¶ 20). Napier allegedly asked Jarvis "how testifying against him was working out for [Jarvis]." *Id.* at PageID.363 (¶ 21). Around the same time, Jarvis maintains, "Napier began openly criticizing [him] as incompetent in front of other Corteva employees" and "chastising [Jarvis] for how [he] handled safety violations within the workplace." *Id.* (¶¶ 22, 24).

4

A few months later, in January 2022, Jarvis received an "Unsatisfactory" performance review for the prior year, 2021.  ECF No. 47-3, at PageID.285.  Napier explained that "while [Jarvis'] performance for the entire year was marginally acceptable, [his] performance for the final 6 months of the year was unsatisfactory."  *Id.* There were several reasons offered for why Jarvis' "performance did not meet expectations":  (1) Jarvis had been "[o]verstating, exaggerating and making unsubstantiated statements" about safety violations and when asked about those allegations, he "said [he] misspoke and did not witness them;" (2) Jarvis "ma[d]e disparaging comments about contractors and vendors;" (3) Jarvis failed to follow his supervisor's instructions and complete tasks he was responsible for; and (4) finally, "[a] recent issue to resolve a transaction on the company credit card in an accurate and timely fashion remain[ed] unresolved."  *Id.* at PageID.285-86 (emphases omitted).  In April 2022, Jarvis was put on a Performance Improvement Plan (PIP).  *Id.*  That plan detailed these deficiencies in Jarvis' performance, and noted that during the PIP period, Jarvis was expected to make progress in certain identified areas—failure to do so "could result in separation" from the company.  *Id.* at PageID.287 (emphasis omitted).

Just before Jarvis was placed on the PIP, in March 2022, Corteva opened a new investigation (the "Credit Card Investigation"), this time into Jarvis himself, based on an ethics complaint that Napier made to Corteva's corporate ethics committee "related to Travel Expense Report discrepancies and charges to Plaintiff's company credit card."

ECF No. 47, at PageID.227 (Def.'s CSF ¶ 12); ECF No. 60-1, at PageID.364 (Jarvis Decl.

¶ 36).  Specifically, in July 2021, a $10 charge appeared on Jarvis' company credit card

for a purchase made at a professional baseball game in California—an unauthorized

transaction under Corteva company policy.  ECF No. 47-3, at PageID.291.  Jarvis

"initially reported the charges on the corporate card as fraudulent, but then changed the

charges to 'personal expenses.'"  *Id.* at PageID.290.  Corteva's Global Ethics

Investigations Leader and an Ethics Compliance Officer conducted the investigation.

ECF No. 47, at PageID.227 (Def.'s CSF ¶ 13).  And the investigators first met with

Napier, who stated that Jarvis "denied that the charge was [his] and stated [he] w[as]

not in California when the purchase was made."  ECF No. 47-3, at PageID.291.  The

investigators then reached out to an employee who manages the Corporate Credit Card

Program, who confirmed that "Citibank had no record of [Jarvis] reporting any

fraudulent use on the corporate credit card."  *Id.*

Next, the investigators interviewed Jarvis himself.  ECF No. 47, at PageID.227

(Def.'s CSF ¶ 14).  Jarvis represented he "did not initially review the $10 charge" in July

2021 because he was "not expecting any charges on the statement," and then stated that

he was "not in California and [he] ha[d] disputed the charge with Citibank."  ECF No.

47-3, at PageID.291.  When asked about his leave status at the time of the transaction,

Jarvis stated he was "on vacation in Arizona for a baseball tournament," but also

"admitted" that he "attended baseball events in San Diego and Irvine, California."  *Id.*

He then "admitted the corporate card could have been inadvertently used to make a purchase from a vendor." *Id.*

Corteva's Ethics Committee met on June 7, 2022, to discuss the results of the investigation. *Id.* at PageID.292. Ultimately, "the Business leadership notified Global Ethics of the disciplinary action taken to terminate" Jarvis. *Id.* Corteva terminated Jarvis' employment effective June 16, 2022. *Id.; see also id.* at PageID.294.

The following spring, in March 2023, Jarvis filed a charge of discrimination with the Hawai'i Civil Rights Commission and the U.S. Equal Employment Opportunity Commission (EEOC). ECF No. 47, at PageID.228 (Def.'s CSF ¶ 19); *see* ECF No. 47-2, at PageID.234-35. After exhausting his administrative remedies, Jarvis initiated this action in September 2023. ECF No. 1. He alleges a retaliation claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and similar state law claims under Hawai'i Revised Statutes (HRS) § 378-2(2) and the Hawai'i Whistleblower Protection Act (HWPA), HRS § 378-61 *et seq.* Jarvis contends that Corteva fired him because he participated in the investigation related to the two other employees' conflict and because he allegedly reported that Napier was discriminatory towards Filipino employees. *See* ECF No. 1, at PageID.7-11. He seeks compensation, including punitive damages, as relief. *Id.* at PageID.11-12.

In its motion for summary judgment, Corteva seeks judgment as a matter of law not only on the federal and state claims, but on Jarvis' request for punitive damages.

ECF No. 46.  In his opposition, Jarvis argues that his federal and state law claims should not be dismissed, but he says nothing in defense of his request for punitive damages. ECF No. 59.  The Court held a hearing on Corteva's motion on April 17, 2025.  ECF No. 68.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted to a moving party that shows there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party initially bears the burden of showing there are no genuine disputes of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  And when, as here, the moving party seeks summary judgment on a claim asserted against them, they must show that the opposing party cannot prove an essential element of the claim.  *Id.* at 322-23.

If the movant makes that showing, the burden shifts to the opposing party, who must "set forth specific facts that show a genuine issue for trial."  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (cleaned up).  This burden "is not a heavy one," as "the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."  *Dark v. Curry County*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006) (cleaned up).  But if the non-moving party altogether fails to defend claims or forms of relief against which summary judgment has been sought, they are deemed "abandoned."  *Jenkins v. County of Riverside*, 398 F.3d

1093, 1095 n.4 (9th Cir. 2005); *see also Shakur v. Schriro*, 514 F.3d 878, 893 (9th Cir. 2008) (explaining that "a plaintiff has abandoned claims by not raising them in opposition to the defendant's motion for summary judgment" (cleaned up)).

It is not for the court at summary judgment to "weigh conflicting evidence with respect to a disputed material fact," nor to assess the credibility of the evidence—those are determinations best left for the factfinder. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Instead, in deciding such a motion, the court must take the nonmoving party's evidence as true and draw all reasonable inferences in that party's favor. *See id.* at 631-32.  And if those facts and inferences show that "a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.* at 631.

## DISCUSSION

### A.    Title VII and HRS § 378-2 Retaliation

Jarvis brings a claim of retaliation under both Title VII and HRS § 378-2, and Corteva seeks summary judgment on both.

Title VII is the federal employment law that prohibits discrimination based on a variety of protected characteristics, including race and color.  It prohibits an employer from retaliating against an employee who opposes practices or actions proscribed by the statute.  *See* 42 U.S.C. § 2000e-3(a).  And HRS § 378-2(2) (2015) similarly makes it unlawful for an employer to "discharge, expel, or otherwise discriminate against any

individual because the individual has opposed any practice forbidden by this part or

has filed a complaint, testified, or assisted in any proceeding respecting the

discriminatory practices prohibited under this part."

Jarvis and Corteva do not contend that the state and federal retaliation standards

differ, and courts in this district have repeatedly evaluated retaliation claims under the

same legal standard.  *See, e.g., Cruz v. Kaiser Found. Hosps.*, Civ. No. 23-00630, 2025 WL

951099, at *7 (D. Haw. Mar. 28, 2025).  The court therefore accepts that the federal and

state laws employ the same legal standards.

To make out a prima facie case of retaliation under both statutes, "a plaintiff

must show (1) involvement in a protected activity, (2) an adverse employment action

and (3) a causal link between the two."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th

Cir. 2000).  Since the question here is merely whether a genuine dispute of material fact

exists as to whether a plaintiff can meet these requirements, "[t]he degree of proof

necessary to establish a prima facie case on a motion for summary judgment is

'minimal' or 'very little.'"  *Nohara v. DeJoy*, Civ. No. 20-00553, 2023 WL 3791637, at *5 (D.

Haw. June 2, 2023) (quoting *Chuang v. Univ. of Cal. Davis Bd. of Trs.*, 225 F.3d 1115, 1124

(9th Cir. 2000)).  If a plaintiff meets that minimal burden, "the burden of production

shifts to the employer to present legitimate reasons for the adverse employment action."

*Brooks*, 229 F.3d at 928.  And if the employer articulates a legitimate reason for that

action, then a plaintiff must "tender a genuine issue of material fact as to pretext in

10

order to avoid summary judgment" by "produc[ing] specific, substantial evidence of

pretext." *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997) (cleaned up).

### 1.    The Prima Facie Case

The court first considers whether Jarvis has created a genuine dispute of fact as

to whether he could make out a prima facie case at trial.

### a.    Protected Activity

The first question is whether Jarvis has offered evidence from which a rational

jury could find that he engaged in a protected activity.  Under Title VII, a protected

activity includes (1) "participat[ing] in any manner in an investigation, proceeding, or

hearing under" Title VII, or (2) "oppos[ing] any practice made an unlawful employment

practice by" Title VII.  42 U.S.C. § 2000e-3(a).  Jarvis does not argue that he participated

in a covered investigation, proceeding, or hearing; his only argument is that he opposed

an unlawful employment practice.  *See* ECF No. 59, at PageID.348 (arguing only that "he

was subjected to a campaign of pervasive illegal retaliation after *opposing* illegal

discrimination in Defendant's workplace" (emphasis added)); *see also id.* at PageID.347-

48 ("Plaintiff aptly has demonstrated that he *opposed* illegal discrimination, and was

subsequently subjected to illegal retaliation up to an[d] including termination."

(emphasis added)).

Nor does it appear that Jarvis *could* have persuasively argued that he participated

in a covered investigation.  Precedent supports the conclusion that "participation" only

11

covers "persons who participate in the EEOC process," *Phillips v. Mabus*, Civil No. 12-

00384, 2013 WL 4662960, at *14 (D. Haw. Aug. 29, 2013), *aff'd*, 607 F. App'x 762 (9th Cir.

2015), and that it "does not protect a person from adverse employment actions taken in

response to an employee's participation in an internal employer investigation," *Helmick*

*v. Collins*, No. CV-22-00571, 2025 WL 861474, at *6 (D. Ariz. Mar. 19, 2025). Jarvis'

participation in the Agronomist Investigation was limited to being interviewed during

the internal employer investigation. And the only EEOC process in which Jarvis

participated was his own; he does not allege that he was further retaliated against after

the filing of his own EEOC complaint. In any event, because Jarvis has chosen not to

argue that he participated in a covered investigation, any such argument is forfeited.

That leaves the question of whether Jarvis has offered sufficient evidence that he

"opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C.

§ 2000e-3(a). This provision protects "an employee who opposes employment practices

reasonably believed to be discriminatory . . . whether or not the practice is actually

discriminatory." *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.*, 685 F.2d 1149, 1157 (9th

Cir. 1982). And under this provision, a practice is reasonably believed to be unlawful

discrimination if it "has a disproportionate impact on a protected group." *Id.*

By way of his sworn statement, Jarvis has offered evidence that he told the

investigator handling the Agronomist Investigation that the agronomist's conduct was

motivated by racial animus. In particular, Jarvis attests that he "told Corteva's

investigator that the agronomist was discriminatory toward Filipino employees."  ECF

No. 60-1, at PageID.361 (Jarvis Decl. ¶ 10).  Jarvis further attests that he told Corteva's

investigator that his direct supervisor, Napier, had made several discriminatory

remarks towards Filipino employees in the past.  *Id.* at PageID.362 (Jarvis Decl. ¶¶ 13-

18).  Both of these statements are a report of alleged discrimination based on race, which

is an employment practice made unlawful by Title VII.  Indeed, Corteva does not

dispute that if true, Jarvis' statements about the alleged racial discrimination would

amount to opposition to actions that could be "reasonably perceive[d] as

discrimination."  *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988).  That is,

Corteva does not dispute that Jarvis' statements about racial discrimination would

"fairly fall within the protection of Title VII."  *Id.*

　　　　Corteva instead points to two items of evidence that suggest Jarvis did not

actually report the alleged racial discrimination during the Agronomist Investigation.

First, the notes from the investigator's interview of Jarvis, prepared contemporaneously

during the Agronomist Investigation, do not reference any comments about race.  ECF

No. 47, at PageID.227 (Def.'s CSF ¶ 11).  And the notes further state that Jarvis was "not

with [the two employees]" during the incident, and that he "[n]ever saw any negative

interactions" between them.  ECF No. 47-5, at PageID.298.  Second, in its reply to Jarvis'

opposition, Corteva attaches deposition testimony in which Jarvis himself appears to

walk back at least part of his statements that he reported some of Napier's derogatory

comments to Corteva.  *See* ECF No. 63-2, at PageID.398-99, 401 (Jarvis testifying that he

did not report that Napier called other employees "slaves" to Corteva).

The court cannot grant summary judgment on these grounds.  Jarvis' sworn

declaration presents at least some evidence that he participated in a protected activity—

that is, it states that during the Agronomist Investigation, he reported that the incident

was motivated by racial discrimination and he separately told the investigator about

racially discriminatory remarks made by his supervisor.  To be sure, the fact that

contemporaneous notes do not support Jarvis' narrative, and the fact that Jarvis himself

appears to have withdrawn at least some of the particulars of his claims during his

deposition, may well cast substantial doubt on Jarvis' credibility at trial.  But at the

summary judgment stage, the court may not "weigh the evidence or make credibility

determinations."  *Kahin v. United States*, 101 F. Supp. 2d 1299, 1302 (S.D. Cal. 2000); *see*

*also T.W. Elec. Serv.*, 809 F.2d at 630.

Corteva separately contends that Jarvis has not identified any protected activity

because in his EEOC charge, he only lists the relevant time period for retaliation as

between December 2021 and June 2022, ECF No. 47-2, at PageID.234-35, and the "only

investigation [Jarvis] participated in during that time was the investigation into his own

credit card misuse."  ECF No. 46-1, at PageID.209.  In effect, Corteva argues that Jarvis

did not oppose any discrimination during the listed time period, and therefore Corteva

cannot be liable for retaliation.  It is fair to suggest that Jarvis could have drafted his

EEOC charge more capaciously.  At the same time, the entirety of the EEOC charge

makes it reasonably clear that Jarvis contends that the negative performance review, the

PIP, the ethics investigation, and his ultimate termination, all of which occurred

between January and June 2022, constituted retaliation for his earlier participation in the

Agronomist Investigation—which occurred in September and October 2021, but which

he mistakenly listed as occurring in "December 2021."  ECF No. 47-2, at PageID.234.

Given the court's obligation to construe EEOC charges "with utmost liberality," it

declines to grant summary judgment against Jarvis merely because of arguable drafting

deficiencies.  *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002) (cleaned up).

Because Jarvis has made out a triable issue as to whether he engaged in a

protected activity, Corteva is not entitled to summary judgment on that ground.

### b.    Adverse Employment Action

The next part of the prima facie case requires Jarvis to show that an adverse

employment action was taken against him.  Corteva contends that he has not offered

sufficient evidence of this requirement to survive summary judgment.

Unlike Title VII's anti-discrimination provision, Title VII's anti-retaliation

provision "applies only when the retaliatory action is 'materially adverse,' meaning that

it causes 'significant' harm."  *Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024)

(quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  And in the

retaliation context, "material" or "significant" means that an action is "likely to

dissuade or deter a reasonable employee from making or supporting a charge of discrimination." *Stucky v. Haw. Dep't of Educ.*, Civ. No. 06-00002, 2007 WL 602105, at *4 (D. Haw. Feb. 15, 2007). The "determination as to whether an action is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position." *Xu v. LightSmyth Techs., Inc.*, No. 23-35423, 2024 WL 4562748, at *2 (9th Cir. Oct. 24, 2024) (cleaned up).

At the hearing on Corteva's motion, Jarvis' counsel clarified that he does not argue that the alleged slights against Jarvis in the months immediately following the Agronomist Investigation constitute adverse employment actions. These alleged slights include the fact that "[w]ithin a few days" of reporting the alleged discrimination in his Agronomist Investigation interview, "Napier began excluding [Jarvis] from the weekly management meetings;" around the same time, "Napier began openly criticizing [Jarvis] as incompetent in front of other Corteva employees;" and a few days after Jarvis' interview with the Corteva investigator, "Napier asked [Jarvis] how testifying against him was working out;" ECF No. 60-1, at PageID.361-62 (Jarvis Decl. ¶¶ 20-22).

Jarvis' counsel explained at the hearing that he instead views these slights merely as evidence of the alleged underlying animus that motivated three more serious and consequential actions: (1) a negative performance review in January 2022, (2) Jarvis'

placement on a PIP in April 2022, and (3) Jarvis' termination in June 2022.  The court

therefore limits its analysis to these three alleged adverse employment actions.[1]

Corteva, for its part, does not meaningfully dispute that all three of these events,

if adequately proved at trial, would qualify as adverse employment actions.  And the

court agrees, upon an independent review of the record, that Jarvis has at least created a

genuine dispute of material fact that all three were "material" or "significant" adverse

employment actions.  First, Jarvis' negative performance review meant that he was not

eligible for an annual merit bonus—and the foreclosure of that extra compensation, as

well as an "Unsatisfactory" performance review that could have other effects on one's

prospects for say, promotion, constitutes the kind of action that would deter a

reasonable employee from reporting Title VII discrimination.  Similarly, being placed

on a PIP meant that Jarvis was subject to heightened scrutiny for his performance and

behavior, and that he was subject to termination during that review period.  And,

finally, it is undisputed that being fired after allegedly reporting racial discrimination

"well might have dissuaded a reasonable worker from making or supporting a charge

of discrimination."  *White*, 548 U.S. at 68 (cleaned up).

---

[1]    At the hearing on this motion, Corteva's counsel candidly acknowledged the
possibility of a fourth adverse employment action:  Napier's removal of Jarvis' duties
on the management contract administrator team.  ECF No. 47-2, at PageID.234.  But
Jarvis himself did not rely on this action in his briefing opposing the motion, and he has
therefore forfeited reliance on that action as an adverse employment action.

Jarvis has, therefore, offered sufficient evidence of an adverse employment action to survive summary judgment.

### c.    Causation

The last element in the prima facie case is a causal link between the protected activity and the adverse employment action(s).  "Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of surrounding circumstances."  *deBarros v. Wal-Mart Stores, Inc.*, No. 11-cv-06116, 2013 WL 3199670, at *7 (D. Or. June 19, 2013).  Jarvis can meet the "causal link" element by showing that there is "evidence sufficient to raise the inference that h[is] protected activity was the likely reason for the adverse action."  *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).  Such an inference can be supported by the "closeness in time" between the protected activity and the adverse action.  *Lau v. Mayorkas*, Case No. 21-cv-4756, 2022 WL 22885366, at *10 (N.D. Cal. Apr. 27, 2022).  Or a causal connection "can be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activity."  *deBarros*, 2013 WL 3199670, at *7; *see also Cohen*, 686 F.2d at 796 ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").  And "[c]ourts consistently impute knowledge where the person receiving notice of harassment is a supervisor or manager possessing substantial authority to hire, fire, promote, or discipline employees."  *Lamb v. Household Credit Servs.*, 956 F. Supp. 1511, 1516 (N.D. Cal. 1997).

There is no dispute that Corteva knew that Jarvis participated in the Agronomist Investigation.  The parties, of course, contest whether Jarvis in fact reported to Corteva that he thought his colleagues' conflict was racially motivated and that Napier had made discriminatory comments.  But because the court has already determined that a rational jury could find that Jarvis engaged in a protected activity by reporting racial discrimination during the Agronomist Investigation, it sets those issues aside.  Instead, the court focuses on whether Jarvis can show a genuine dispute of material fact as to a causal link between his participation in the Agronomist Investigation, which occurred sometime between September and October 2021, and the three adverse employment actions, which began in January 2022 with his negative performance review.

One factor in determining whether there is a causal link is the temporal proximity.  The closer in time between the protected activity and the adverse employment action, the clearer the causal link.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.").  And while "[c]ourts have not identified a bright-line rule," a timeframe "ranging from 42 days up to three months has been found sufficient to establish temporal proximity," whereas "a lapse of four or more months has been found to be too long."  *Pratt v. Haw. Dep't of Pub. Safety*, 308 F. Supp. 3d 1131, 1147 (D. Haw. 2018).

19

Start with the negative performance review.  To be sure, the time gap between the Agronomist Investigation in September-October 2021 and Jarvis' "Unsatisfactory" performance review in January 2022 is right on the cusp of what courts would view as a close temporal connection.[2]  Drawing all inferences in Jarvis' favor, however, it is at least rational to infer that such a negative performance review could be related to his participation in the Agronomist Investigation in the fall of 2021.  That is particularly true because while "a lack of temporal proximity may make it more difficult to show causation, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference."  *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005) (cleaned up).  And Jarvis attests that, leading up to the negative performance review, he was subjected to increasingly harsh comments from Napier about his work performance, some of which were made in front of other coworkers.  In the days after his Agronomist Investigation interview, moreover, Jarvis was removed from management meetings and Napier asked Jarvis how testifying against him was "working out."  Taking this circumstantial evidence together with the relatively close temporal proximity, a rational jury could find that the progression of derogatory

---

[2]     Corteva would start the clock much later: it contends that the gap should be measured between the Agronomist Investigation in September-October 2021 and Jarvis' PIP in April 2022.  *See* ECF No. 62, at PageID.378.  But because Jarvis' negative performance review had immediate consequences, including his ineligibility to receive a raise or a merit bonus (which Corteva admits), the court views January 2022 as the right date to measure when adverse employment action was taken.

comments and smaller steps taken against Jarvis led to the first material adverse

employment action:  the negative performance review.  And that negative review

reduced his pay and set him up for the PIP, which in turn could have factored into his

termination.

Timing, though, is not Jarvis' only circumstantial evidence of causation.  Here,

the causal link between the Investigation and the negative performance review is

strengthened by evidence that the review was not clearly related to a change in Jarvis'

work performance alone.  The record shows the following:  Jarvis received a

"Consistent" rating in his 2021 annual performance review (given for the 2020 calendar

year), although Napier noted that he had doubts about Jarvis' performance given

"challenges with [Jarvis'] personal expenses charged to a company credit card,"

"personal use and loss of [a] company phone," and "behavioral challenges."  ECF No.

47-4, at PageID.295.  While that performance review was not entirely glowing, Napier

did not suggest that Jarvis' work performance was clearly deficient at that time.  But by

Jarvis' 2022 annual performance, given for the 2021 calendar year, Napier decisively

rated Jarvis' conduct as subpar—and Napier noted that Jarvis' performance was

particularly "unsatisfactory" in the "final 6 months" of 2021, which includes the months

in which the Investigation occurred.  ECF No. 47-3, at PageID.285.  Jarvis' 2022

performance review noted concerns similar to those raised in his 2021 review, but with

significantly more detail:  Napier stated that Jarvis had been "[o]verstating,

exaggerating and making unsubstantiated statements" about safety violations;

"accusing the [supervisor] of not including [Jarvis] on Safety Communications sent to

the rest of Leadership team;" and making "disparaging comments about contractors

and vendors." *Id.* (emphases omitted).  Between the two performance reviews, then, the

volume of the criticism was turned up in the one delivered in January 2022.  A rational

jury could therefore find that the only major difference in Jarvis' conduct between the

two reviews, separated by only a year, was his participation in the Agronomist

Investigation.  From there, a rational jury could conclude it was that difference that

motivated the change in his performance rating.  *See Yartzoff v. Thomas*, 809 F.2d 1371,

1377 (9th Cir. 1987) (denying summary judgment to employer where employee

"introduced evidence that for years prior to the filing of his complaints, he had always

received performance ratings of average and above average on all employment indices"

but "[f]ollowing the filing of his administrative complaints and his April 1980 meeting

with his supervisor to discuss his Title VII grievances . . . he received a sub-average

rating for cooperativeness for the first time").

        For similar reasons, the court concludes that Jarvis has made out a triable issue

on the causal connection between the PIP and the Agronomist Investigation.  Again,

there is a relatively close temporal proximity between the two, given that Jarvis

reported racial discrimination during the Agronomist Investigation in the fall of 2021

and the following spring, he was placed on the PIP.  Viewed in the light most favorable

to Jarvis, the PIP can be reasonably seen as a sequential step in Napier's alleged grand scheme to target Jarvis for his comments in the Agronomist Investigation.  Corteva's argument that the PIP is too far removed temporally from the Agronomist Investigation, since the two events are separated by nearly seven months, is not convincing in the face of evidence that Napier continued to make smaller jabs at Jarvis in the months following the Agronomist Investigation, and that Jarvis was given a negative performance review in January 2022.  It is a reasonable next step for a factfinder to infer that the PIP, a direct result of and connected to the negative performance review, related back to the Agronomist Investigation, even though there were several months separating the two events.  *See Powell v. Mayorkas*, Case No. CV 22-02444, 2024 WL 2244979, at *6 (C.D. Cal. Mar. 19, 2024) ("When an employer engages in a series of adverse actions, temporal proximity coupled with other circumstantial evidence, 'provides strong circumstantial evidence of retaliation.'" (quoting *Bell v. Clackamas County*, 341 F.3d 858, 866 (9th Cir. 2003))).

        That leaves the question of causation between the Agronomist Investigation and Jarvis' ultimate termination.  At this stage, the court also concludes that a rational jury could find that Jarvis' participation in the Agronomist Investigation "was a but-for cause—but not necessarily the only cause—of h[is] termination."  *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013).  No one disputes that there was at least one cause for Jarvis' termination:  his misuse of his corporate credit card, as

23

revealed through the Credit Card Investigation.  But taking the court's reasoning on the other two adverse employment actions a step further, it is straightforward to view Jarvis' termination as the last in a series of increasingly severe negative actions taken against him because he opposed Napier's (and the agronomist's) discriminatory actions.

While Corteva would measure the time gap between the Agronomist Investigation and the termination as too long to infer a causal connection—since there was a period of nine months between the September or October 2021 interview and June 2022 termination—that argument again falls short.  Temporal proximity is often used as a proxy for causation when there is no other evidence that an adverse employment action was taken because of an employee's participation in a protected activity.  *See Gwin v. Target Corp.*, Case No. 12-05995, 2013 WL 5424711, at *13 (N.D. Cal. Sept. 27, 2013) ("[T]he timing of an adverse employment action is only one of many ways a plaintiff can establish causation.").  Here, though, there is other evidence of a connection between the protected activity and termination:  Jarvis' removal from weekly management meetings, Napier's comments to Jarvis in the months thereafter, the negative performance review, and the PIP.

Granted, there is still some question as to whether Napier had any responsibility for Jarvis' ultimate termination.  A plaintiff can meet the causation element "[b]y showing that a supervisor retaliated against the plaintiff by causing management to fire him"; this theory is often called the "cat's paw."  *Sandowski v. McAleenan*, 423 F. Supp.

3d 959, 979 (D. Haw. 2019).  Under this theory, a plaintiff "must show that (1) a

supervisor performed an act motivated by retaliatory animus, (2) that act was intended

by the supervisor to cause an adverse employment action, and (3) that act caused the

adverse employment action."  *Id*. (cleaned up).  So even if there is an independent

investigation, and "the biased subordinate was not the principal decisionmaker, the

biased subordinate's retaliatory motive will be imputed to the employer if the

subordinate influenced, affected, or was involved in the adverse employment decision."

*Poland v. Chertoff*, 494 F.3d 1174, 1183 (9th Cir. 2007).

The court concludes that at this stage, there is at least a genuine issue of material

fact as to whether Napier's influence in reporting the credit card misuse to the Ethics

Committee could have had some additional sway in the ultimate decision to terminate

Jarvis.  Notably, Napier was responsible for initiating the ethics complaint for the credit

card misuse, and he was one of the first employees that the investigators interviewed.

Napier told the investigators that Jarvis "denied" the charge, noted that Jarvis "was

previously verbally counseled in 2020 regarding misuse of the corporate credit card,"

and "provided records reflecting [Jarvis] was on leave status during the time the

purchase was made."  ECF No. 47-3, at PageID.291.  And while Napier does not appear

to have been involved further with the Credit Card Investigation, it is at least plausible

that a rational jury could believe that Napier was motivated to initiate the ethics

complaint based on Jarvis' protected activity, that he intended for that complaint to lead

25

to an adverse action against Jarvis—up to and including termination—and that Napier's actions influenced the result of the Credit Card Investigation.  Moreover, the record at this stage is not entirely clear as to who made the ultimate decision to terminate Jarvis: while the Ethics Committee met "on June 7, 2022 to discuss the investigation and to determine the appropriate course of action," it appears that "Business leadership" made the final decision:  a few weeks later, "[o]n June 23, 2022, the Business leadership notified Global Ethics of the disciplinary action taken to terminate" Jarvis.  *Id.* at PageID.292.  Neither party has explained which individuals form the "Business leadership" team that made that decision, or whether Napier is a part of that team.  But on the current record, it is reasonable to infer that the decision was "somehow tainted by" Napier's influence, whether he was a formal part of that team or not.  *deBarros*, 2013 WL 3199670, at *7.

Compare, for example, *Poland v. Chertoff*, in which the Ninth Circuit explained that the "initiation of [an] administrative inquiry, on its own, would not be sufficient to impute [a supervisor's] animus" to an employer's decision to take an adverse employment action.  494 F.3d at 1183.  The Ninth Circuit nonetheless concluded that the employer's adverse employment action in *Poland* was infected by the manager's discriminatory "animus" because the panel of decisionmakers also reviewed the manager's "lengthy memo" that contained negative comments about the employee.  *Id.* Here, a factfinder could similarly find that Napier's report of Jarvis' misuse of the

26

company credit card, during the period when Jarvis was placed on a PIP, was motivated by Napier's animus for the report of his allegedly discriminatory remarks. And while Napier does not appear to have detailed Jarvis' other behavioral or performance-related concerns for the Ethics Committee, he did provide information to the investigators that indicated Jarvis was potentially mischaracterizing whether the charge was fraudulent—the ethics report specifically noted that Napier "stated [that Jarvis] denied that the charge was [his] and stated [he] w[as] not in California when the purchase was made," told the ethics investigator that Jarvis "was previously verbally counseled in 2020 regarding misuse of the corporate credit card," and Napier "provided records reflecting [Jarvis] was on leave status during the time the purchase was made." ECF No. 47-3, at PageID.291.

Jarvis has therefore raised a genuine dispute of material fact as to his ability to show causation between the protected activity and each of the three adverse actions— and in turn, he has shown that he could make out a prima facie case at trial.

### 2.    Legitimate Reasons and Pretext

Because Jarvis can potentially make out a prima facie case at trial, the burden shifts to Corteva to produce a legitimate reason for taking the adverse employment actions against him.  At this stage of the burden-shifting, "[t]he employer need not persuade the court that it was actually motivated by the proffered reasons."  *Yartzoff*, 809 F.2d at 1376.  Instead, the employer "need only produce admissible evidence which

would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* (cleaned up).

Corteva has produced legitimate reasons for the negative performance review, PIP, and termination: it offers evidence that the negative performance review and PIP were related to Jarvis' behavioral concerns and subpar work output, and that his termination was purely the "result of an ethics violation" for his "misuse of the company credit card." ECF No. 46-1, at PageID.218. These are sufficient non-discriminatory reasons for each of these actions. *See, e.g.*, *Nohara*, 2023 WL 3791637, at *7 (holding that employer provided non-retaliatory, legitimate reason for issuing a "Letter of Instruction" that provided "a list of action items on improvements" where employee "was not timely producing reports, and he was not communicating well" (cleaned up)); *Sievert v. City of Sparks*, No. 12-cv-0526, 2015 WL 476148, at *8 (D. Nev. Feb. 5, 2015) (finding nondiscriminatory reason for negative performance review where employer "not[ed] specific examples of misconduct and [the employee's] perceived inability to take responsibility for her actions").

The burden therefore shifts back to Jarvis to provide "specific and substantial evidence that the defendant's non-retaliatory reason is pretextual." *Lane v. Wilkie*, No. 19-cv-1918, 2021 WL 3269661, at *6 (S.D. Cal. July 30, 2021) (cleaned up). He can do so by showing that "either a discriminatory reason more likely motivated" Corteva's adverse actions, or that Corteva's "proffered explanation is unworthy of credence."

28

*Villiarimo*, 281 F.3d at 1063 (cleaned up); *see also Chuang*, 225 F.3d at 1127 ("[A] plaintiff

can prove pretext in two ways:  (1) indirectly, by showing that the employer's proffered

explanation is unworthy of credence because it is internally inconsistent or otherwise

not believable, or (2) directly, by showing that unlawful discrimination more likely

motivated the employer." (cleaned up)).  In certain circumstances, a plaintiff "can

survive summary judgment without producing any evidence of discrimination beyond

that constituting his prima facie case," if the prima facie "evidence raises a genuine

issue of material fact regarding the truth of the employer's proffered reasons." *Chuang*,

225 F.3d at 1127.

    Critically, in this case, Jarvis does not rely solely on indirect evidence of pretext.

To be sure, he does not have evidence of the smoking gun variety—no one ever outright

admitted that the negative performance review, PIP, and Napier's reporting of the

credit card misuse to the Ethics Committee were retaliatory.  But he does have evidence

amounting to an admission of an intent to shoot:  Napier questioning Jarvis about how

testifying against him was "working out for him" is direct evidence that the adverse

employment actions that followed, though superficially justified, were part of a broader

scheme to get back at Jarvis for that testimony.  *Cf. id.* at 1128 (finding direct evidence of

pretext where a member of employer's "decisionmaking body" used a racial slur).  And

"[w]ith direct evidence, a triable issue as to the actual motivation of the employer is

created even if the evidence is not substantial." *Id.* (cleaned up).  While only supported

by his sworn statement, Jarvis' identification of that single comment—which is direct evidence of Napier's retaliatory motive—creates a genuine dispute of material fact as to whether Corteva's allegedly nondiscriminatory reasons for firing Jarvis were in fact pretextual.

That said, granting summary judgment to an employer is sometimes warranted where a plaintiff "has created only a weak issue" as to whether an employer's nondiscriminatory reasons "were untrue against a backdrop of abundant and uncontroverted independent evidence that no discrimination has occurred." *Opara v. Yellen*, 57 F.4th 709, 726 (9th Cir. 2023) (cleaned up). And in at least one case, the Ninth Circuit held that while a plaintiff's account of a supervisor's allegedly discriminatory comments constituted "sufficient direct evidence to support a prima facie case of age discrimination, at the pretext stage, we have refused to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony." *Id.* (cleaned up).

Even where direct evidence is weak, however, "a combination of the two kinds of evidence," direct and circumstantial, can be sufficient "to establish pretext." *Chuang*, 225 F.3d at 1127. And here, in addition to the direct evidence, there is at least some indirect evidence of pretext in the record. The Ninth Circuit has noted that "where the evidence of pretext is circumstantial, rather than direct, the plaintiff must present specific and substantial facts showing that there is a genuine issue for trial . . . [but] that

requirement is tempered by our observation that, in the context of Title VII claims, the

burden on plaintiffs to raise a triable issue of fact as to pretext is hardly an onerous

one." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (cleaned up)).  If credited,

Jarvis' account of the chain of negative actions taken against him could lead a

reasonable jury to find that the significantly more detailed and negative performance

review, the PIP, and his termination all were motivated by his conduct during the

Agronomist Investigation, rather than justified by Jarvis' poor behavior or ethics

violation.  *See Goff v. Washington County*, Case No. CV 03-268, 2005 WL 8165291, at *10

(D. Idaho Mar. 10, 2005) (noting that "the Ninth Circuit has held that a series of adverse

employment decisions is probative of pretext" and denying summary judgment to an

employer where an employee "allege[d] that her eventual termination culminated a

series of adverse decisions").

As with the evidence supporting Jarvis' prima facie causation element, there is

evidence suggesting that Napier harbored bias against Jarvis after the Agronomist

Investigation and that Napier was involved in each of the subsequent adverse

employment actions.  First, as noted, Napier made a direct comment to Jarvis shortly

after the Agronomist Investigation, asking him how the reporting of Napier's

discriminatory behavior was "working out."  A few months later, Napier issued a

negative performance review that is much more critical of Jarvis' behavior and actions

than it had been the year prior:  while Jarvis had received a "Consistent" rating in

January 2021 for the prior year that included some comments about his behavioral

challenges, a year later in January 2022—after he participated in the Agronomist

Investigation—he received an "Unsatisfactory" rating for the same issues.  *See id.*

(denying summary judgment to employer on pretext where the employee "presented

evidence that she was not disciplined for similar behavior prior to" engaging in a

protected activity).  Finally, Jarvis could show by cross-examination of the witnesses,

for example, that Napier's retaliatory animus infected the negative performance review,

implementation of the PIP, and the complaint of Jarvis' corporate credit card misuse.

*See Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996) (reversing district

court's grant of summary judgment to an employer and reasoning that "[a]lthough it is

possible that [the employer] sufficiently insulated the decision-making process from the

discriminatory remarks of the directors, in light of the reluctance of this Circuit to allow

summary judgment where there is direct or circumstantial evidence of discriminatory

intent, the district court was premature in resolving this issue on summary judgment").

Taken together, there is a genuine issue of material fact as to whether Corteva's

proffered reasons for the negative performance review, PIP, and Jarvis' ultimate

termination were pretextual.

*      *      *

Jarvis has set forth sufficient evidence from which he could establish a prima

facie case and show that the reason for the adverse actions taken against him were

pretextual at trial.  The court therefore DENIES Corteva's summary judgment motion

on Jarvis' Title VII and HRS § 378-2 retaliation claims.

**B.    Hawaiʻi Whistleblower Protection Act**

Jarvis also alleges claims of unlawful retaliation and wrongful termination under

the Hawaiʻi Whistleblower Protection Act, or HWPA.  That statute protects employees

from discrimination or retaliation for reporting discriminatory conduct in the

workplace.  Specifically, it provides that an employer "shall not discharge, threaten, or

otherwise discriminate against an employee regarding the employee's compensation,

terms, conditions, location, or privileges of employment because . . . [t]he

employee . . . reports or is about to report to the employer, or . . . to a public body,

verbally or in writing, a violation or a suspected violation of" a state or federal law.

HRS § 378-62(1) (2015).[3]  The HWPA is broader in its scope than HRS § 378-2 because it

can protect employees who report on violations that go beyond Title VII's protections—

say, for example, violations of wage and overtime laws.  *See Tagupa v. VIPdesk, Inc.*, 125

F. Supp. 3d 1108, 1121 (D. Haw. 2015).  But the standard for evaluating a claim under

the HWPA parallels Title VII's retaliation framework:  an employee must show (1) that

they "engaged in protected conduct as defined by HRS § 378-62(1)," (2) that their

employer took an "adverse action" against them, and (3) "a causal connection between

---

[3]    HRS § 378-62(1)(A) specifically prohibits retaliation against any employee who
"reports . . . a violation" of "[a] law, rule, ordinance, or regulation, adopted pursuant to
law of this State, a political subdivision of this State, or the United States."

the alleged retaliation and the whistleblowing," meaning that "an employer's challenged action must have been taken because the employee engaged in protected conduct." *Id.* at 1119 (cleaned up). When a plaintiff brings claims under both Title VII and the HWPA that "arise from precisely the same alleged conduct," "the standard applied to evaluate" the retaliation claims "is the same." *Bassett v. Haw. Disability Rts. Ctr.*, Civ. No. 18-00475, 2020 WL 7351113, at *9-10 (D. Haw. Nov. 20, 2020).

Jarvis' claims under the HWPA mirror those brought under Title VII. He alleges the same facts as the basis for the whistleblowing "protected activity": namely, that he reported racial discrimination to Corteva during the Agronomist Investigation. *See* ECF No. 1, at PageID.10-11. And he points to the same adverse employment actions. *Id.* In effect, Jarvis' whistleblower claims "appear to be premised upon the exact same facts as those of his Title VII retaliation claims," and so his HWPA claims must stand or fall on the same grounds. *Bassett*, 2020 WL 7351113, at *16 (cleaned up).

Because the court has concluded that Corteva is not entitled to summary judgment on Jarvis' Title VII and Hawaiʻi state law retaliation claims, it also DENIES summary judgment to Corteva on his HWPA claims.

## C.    Punitive Damages

As a final matter, Corteva seeks summary judgment on Jarvis' request for punitive damages.

In his complaint, Jarvis appears to request punitive damages both as an independent claim, and as part of his entitlement to relief.  ECF No. 1, at PageID.11-12.  A claim for punitive damages, however, "is not an independent tort, but is purely incidental to a separate cause of action."  *Hale v. Haw. Publ'ns, Inc.*, 468 F. Supp. 2d 1210, 1233 (D. Haw. 2006) (cleaned up).  The court therefore GRANTS summary judgment to Corteva to the extent Jarvis sought to recover on his claim for punitive damage independent of the state or Title VII retaliation claims.

There remains the issue of whether punitive damages should be available to Jarvis as relief for his federal or state law claims.  Here, Corteva contends that the "evidence shows Corteva acted with diligence and forethought in investigating the allegations and claims presented to it," and that Jarvis therefore "will be unable to demonstrate through admissible evidence any malice or reckless indifference by Corteva."  ECF No. 46-1, at PageID.221-22.  In his opposition, Jarvis does not dispute that Corteva has met its burden of showing that he cannot prove an essential element of his request for punitive damages.  *See Celotex Corp.*, 477 U.S. at 322-23.  Indeed, his opposition altogether fails to address punitive damages at all.  His request for punitive damages is therefore deemed "abandoned," *Jenkins*, 398 F.3d at 1095 n.4, and Corteva's motion for summary judgment on Jarvis' request for punitive damages as relief is GRANTED.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Corteva Agriscience, LLC's Motion for

Summary Judgment is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

DATED:  May 6, 2025, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 23-00396 MWJS-RT; *David Jarvis v. Corteva Agriscience, LLC*; ORDER
GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT